**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

---

Steven Thrasher,

           Plaintiff,

    v.                                          JURY TRIAL DEMANDED

Northwestern University;

Tim Walberg, in his official capacity as
Chairman of the
House Committee on Education and the
Workforce, U.S. House of Representatives;

Linda McMahon, in her official capacity as the
Secretary of the Department of Education;

Todd Blanche, in his official capacity as
Attorney General of the United States; and

Robert F. Kennedy, Jr. in his official capacity as
the Secretary of Health and Human Services of
the United States;

           Defendants.

---

## COMPLAINT

The Plaintiff Steven Thrasher ("Dr. Thrasher" or "Plaintiff") brings claims against the

defendants, Northwestern University ("Northwestern" or "the University"); Honorable Tim

Walberg, in his official capacity as Chairman of the House Committee on Education and the

Workforce of the U.S. House of Representatives; Linda McMahon, in her official capacity as the

Secretary of the Department of Education; Todd Blanche, in his official capacity as Attorney

General of the United States; and Robert F. Kennedy, Jr. in his official capacity as the Secretary of

1

Health and Human Services of the United States; (collectively, "Defendants"), and in support of those claims, state as follows:

## NATURE OF CASE

1. Defendants robbed Dr. Thrasher of his successful academic career and livelihood because of a joint project of Northwestern and elements of the federal government to manufacture consent for their participation in the Zionist colonial project in Palestine.

2. In pursuit of this project, the federal government has threatened and retaliated against private universities such as Northwestern for allowing its students and faculty to speak out against the ongoing genocide against the Palestinian people and for tolerating its employees' protection of those students from retaliatory police violence.

3. In April of 2024, Dr. Thrasher linked arms with other faculty and staff to protect students from assault by the Northwestern police during a student-led encampment on the Evanston campus in solidarity with Palestinians undergoing genocide. He also gave a speech urging the protection of journalists in Palestine whom Israel was killing by the dozens, calling on journalists to center compassion and solidarity over elusive notions of journalistic objectivity, referencing a known debate within the field.

4. Under pressure from the federal defendants to this action, Northwestern suspended Dr. Thrasher from teaching; filed a criminal complaint against him; brought internal disciplinary charges against him; and, when the faculty committee it appointed rejected those charges and found the administration had violated Dr. Thrasher's academic freedom, terminated his employment through the tenure process and denied him access to a full internal appeal of his tenure denial.

5. As this case illustrates, Northwestern and the federal government have weakened due process and academic freedom protections for the campus as a whole.

6. Northwestern has effectively blacklisted Dr. Thrasher from academia.

7. Dr. Thrasher brings this action for breach of his employment contract, violation of the Civil Rights Act of 1866, violation of Title VII of the Civil Rights Act of 1964, violation of the Illinois Human Rights Act, and retaliation for his exercise of his freedom of speech as secured by the United States Constitution.

## PARTIES

8. Plaintiff is a professor of journalism residing in Athens, Greece, having been exiled from Chicago, Illinois.

9. Northwestern is a private university with a primary campus in Evanston, Illinois.

10. Tim Walberg is the Chairman of the United States House of Representatives House Committee on Education and the Workforce and that Committee's highest-ranking member. He is sued in his official capacity.

11. Linda McMahon is the Secretary of the United States Department of Education and that agency's highest-ranking official. She is sued in her official capacity.

12. Todd Blanche is the Acting Attorney General and the highest ranking-official of the United States Department of Justice. He is sued in his official capacity.

13. Robert F. Kennedy, Jr. is the Secretary of the United States Department of Health and Human Services and that agency's highest-ranking official. He is sued in his official capacity.

14. Plaintiff refers to Secretary McMahon, Attorney General Blanche, and Secretary Kennedy collectively as "the Agency Defendants."

## JURISDICTION AND VENUE

15. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) because Plaintiff asserts claims arising under the laws of the United States.

16. Plaintiff's state-law claims form part of the same case and controversy and are within the supplemental jurisdiction of the Court pursuant to 28 U.S.C. § 1367.

17. Venue is proper in the United States District Court of the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(1) as the Northern District is "a judicial district in which any defendant resides" and "all defendants are residents of the State in which the district is located." Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2), as the Northern District is "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred[.]"

18. Plaintiff filed a Charge of Discrimination with the Illinois Department of Human Rights ("IDHR") on February 3, 2026, alleging discrimination based on race and sexual orientation, discrimination on the basis of association with Palestinians, and retaliation for opposing discrimination. The charge was cross-filed with the Equal Employment Opportunity Commission ("EEOC").

19. Plaintiff opted out of the IDHR investigation process and requested notices of right to sue from the IDHR and EEOC.

20. Plaintiff files this action within 90 days of the issuance of those notices.

## FACTUAL ALLEGATIONS

### A. Dr. Thrasher's Employment with Northwestern

21. Northwestern appointed Dr. Thrasher as an Assistant Professor and Daniel J. Renberg Chair of Social Justice in Reporting at Medill School of Journalism, Media, Integrated Marketing Communications ("Medill"). His appointment began in June of 2019.

22. As the Daniel J. Renberg Chair, Dr. Thrasher's work was expected to explore journalistic advocacy and scholarly engagement with politically salient topics, including controversial topics.

23. Dr. Thrasher accepted his position as Daniel J. Renberg Chair in part because Northwestern's academic freedom protections protected him against political interference with his "free search for truth and its free exposition."

24. On September 12, 2022, Michael Schill was appointed as President of Northwestern.

4

25. On April 25, 2023, a Medill Promotion and Tenure Committee reported to Medill's Dean, Charles Whitaker, that it had voted unanimously to renew Dr. Thrasher's appointment for another three-year term.

26. Dean Whitaker enthusiastically seconded that recommendation, and President Schill accepted Dean Whitaker's recommendation.

27. On October 24, 2023, Northwestern notified Dr. Thrasher that it was reappointing him as the Daniel J. Renberg Chair, "effective September 1, 2023 through August 31, 2028."

**B.     Northwestern's Student Encampment in Solidarity with Palestinians**

28. Between April 25, 2024, and May 1, 2024, Northwestern students built an encampment at Deering Meadow on Northwestern's Evanston campus in solidarity with Palestinians undergoing Israel's campaign of bombing, mass killing, and humanitarian blockade in Gaza and in protest of the University's financial and political support of Israeli institutions participating in apartheid and oppression against Palestinians.

29. Deering Meadow had long been a space on Northwestern's campus where students and community members have engaged in political speech, including famously in 1969-70 when it became central to protests against the Vietnam War.

30. The 2024 encampment carried forth the Deering Meadow tradition of nonviolent protest and involved the display of signs, speeches, dancing, and prayer, including overtly Jewish religious activities, and community building.

31. The Deering Meadow encampment was attended by many members of the student body, faculty, and staff, including Dr. Thrasher.

32. During a speech at the encampment and on social media, Dr. Thrasher commemorated the more than 143 journalists that Israel had killed in Gaza in the preceding six months and commended the surviving journalists in Gaza for "treating journalism as a public good and as a shared

5

responsibility."

33. In his speech, Dr. Thrasher also challenged the idea that traditional notions of "objectivity" should disqualify journalists, saying,

> Madhoun and his colleagues, such as Hossan Shabat (who is 21 and should be a junior in college like many of you) are changing the game of journalism. Neither of them are "objective." But this is one of the many gifts Palestinian journalists, at great personal sacrifice, are giving to the world: they are giving us a chance to view the role of the journalism in fundamentally different ways, including to see how *interdependence* might be a better way approach our craft than the myth of *independence.* . . . Madhoun, Shabbat and their colleagues report, with great heart and intellect and integrity, on the genocide around them. But they also feed the people around them. They tend to the tears of the crying children. They jump in as medics for the wounded. They sweep the floors of hospitals and dig through the rubble. . . . They are not *objective.* . . . To the Medill students and journalists within ear shot, I say to you: our work is not about objectivity. Our work is not about "scooping" one another. Our work is about you putting your brilliant minds to work, and opening your compassionate hearts, and linking your arms together understanding all of our fates are interconnected. Our work is love.

34. On April 27, 2024, the University deployed the Northwestern University Police Department ("NUPD") into the encampment with the intention, according to Evanston Mayor Daniel Biss, of "clear[ing] the encampment and mak[ing] mass arrests."

35. Northwestern faculty and staff members, including Dr. Thrasher, intervened to protect the student protesters from the police by creating a line and linking arms. The NUPD responded to the faculty and staff with excessive and unreasonable force.

36. Immediately after Dr. Thrasher's confrontation with NUPD, Northwestern Trustee Michael Sacks sent President Schill a text message with the request that "we just not hire assholes anymore," referring to a Medill faculty member who engaged with the Deering Meadow encampment.

37. Northwestern's deployment of the NUPD failed to force an end to the Deering Meadow encampment, and Northwestern subsequently entered negotiations with student organizers.

38. On April 29, 2024, student organizers and Northwestern's administration announced an agreement to curb protest activity and wind down the Deering Meadow encampment in return for

6

Northwestern's reestablishment of an advisory committee on university investments, guarantees by Northwestern of additional support for Muslim, Middle Eastern, North African, and Palestinian students, and other commitments ("the Deering Meadow agreement").

39. At the time the deal was announced, President Schill, Provost Kathleen Hagerty and Vice President for Student Affairs Susan Davis released a statement describing the Deering Meadow agreement as "represent[ing] a sustainable and de-escalated path forward [that] enhances the safety of all members of the Northwestern community while providing space for free expression that complies with University rules and policies."

40. Following the announcement of Northwestern's negotiated agreement to end the Deering Meadow encampment, several other universities announced agreements with student protestors ending encampments and protests on their campuses.

**C.      The University's First (Unsuccessful) Attempt to Discipline Dr. Thrasher**

41. The announcement of Northwestern's negotiated agreement to end the Deering Meadow encampment was immediately condemned by several Congressional Republicans and Zionist advocacy groups.

42. On May 10, 2024, the Committee on Education and the Workforce, a U.S. House of Representatives standing committee overseeing education, workforce development, and labor-related issues, ("the Committee") notified President Schill and Northwestern Board of Trustees Chair Peter Barris that it was investigating Northwestern for its "decision to capitulate to antisemitic, pro-terror encampment organizers" by coming to an agreement with them to end the encampment.

43. The Committee's letter characterized Dr. Thrasher's participation in the encampment and his public tweets in support of the encampment students and of Palestine as examples of "antisemitic incidents," citing to several of his X/Twitter posts, including tweets that said, "Free Palestine and bless our courageous students!" and "The Northwestern University Gaza Solidarity

Encampment has survived its first attack. Free speech, Free Palestine!"

44. President Schill was compelled to testify before the Committee on May 23, 2024. During his testimony and in subsequent written statements, President Schill accepted the Committee's framing of the encampment as "antisemitic" and "pro-terror."

45. At the hearing, Congressional members asked President Schill to provide details about how many students and faculty had been disciplined, expelled, or fired, implying that the University's failure to purge the faculty and student body of Palestine solidarity activists was an illustration of anti-Jewish animus. President Schill assured Chairwoman Foxx, "I do not have the precise number, but we have had staff terminations."

46. At the hearing, when Rep. Mark Takano asked whether there were any arrests at the encampment, President Schill said, "There were no arrests needed."

47. At the hearing, Rep. James Banks made clear that the purpose of the hearing was to coerce Northwestern into punishing faculty for political speech. He said,

> "Let me ask you about Stephen [*sic*] Thrasher. He is one of the goons in the photo behind me. . . . He and several of your faculty members locked arms, they scuffled with police officers, blocked the police officers on your campus from doing their job. Do they continue to teach students at Northwestern University after this embarrassing incident? . . . You said in your opening statements that this encampment was responsible for antisemitic behavior that made Jewish students feel unsafe to go to class. Is it okay for faculty members? Is it okay? Do they get away with that at Northwestern University?"

48. When President Schill responded, "I am not going to comment in ongoing investigations and faculty personal matters," Rep. Banks said,

> Unbelievable, unbelievable, President Schill. . . . That those faculty members would continue to have a job. Thrasher, by the way, is something of a professional prognosticator. In fact, he went to Columbia University to participate in their encampment, and you pay his bills. You are responsible for Stephen [*sic*] Thrasher's activities, which is really crazy. . . . 4 billion dollars have gone to your university. We should not give you another taxpayer dollar for the joke your university has become.

49. On June 7, 2024, the Committee sent Northwestern a letter chiding President Schill for

refusing to answer during his testimony regarding whether Dr. Thrasher continued to teach students after he was assaulted by campus police and reiterated its demand that Northwestern provide "[a] list of all faculty and staff disciplinary/conduct cases relating to alleged antisemitic incidents at Northwestern since October 7, 2023, showing the date, incident, case status, entity responsible for reviewing the case, status of the alleged perpetrator (normal status, suspended, terminated, etc.), and case outcome."

50. Less than three weeks after it received the Committee's June 7, 2024, letter, Northwestern filed a criminal complaint against Dr. Thrasher and three others for "Resisting/Obstructing a Peace Officer." Three of the four targets of these complaints were Queer and people of color, and all four of the targets had been particularly vocal or active at the encampment.

51. Following review of the complaint, the Cook County State's Attorney declined to prosecute and closed the matter.

### D. The University's Second (Unsuccessful) Attempt to Exclude Dr. Thrasher from Campus in Retaliation for his Speech in Solidarity with Palestinians

52. On July 8, 2024, just one month after receiving the Committee's June 7, 2024 letter, Northwestern suspended Dr. Thrasher from teaching and opened a misconduct inquiry against him.

53. Northwestern's suspension of Dr. Thrasher was premised on allegations that his speech about Palestine in the classroom and on campus violated the University policy on Civility and Mutual Respect, as well as expectations in the Faculty Handbook.

54. Northwestern further alleged that Dr. Thrasher "[m]ade statements about standards of journalism that are antithetical to our profession and values as a University, including but not limited to [his] declaration in Deering Meadow that [Dr. Thrasher] do[es] not teach students to be 'objective'" and that Dr. Thrasher "engaged in behavior towards members of the Northwestern community and others that has been reported as threatening, demeaning, and harassing."

55. Neither the suspension letter nor the supporting documentation that was subsequently provided identified any improper behavior by Dr. Thrasher that would lead a reasonable student to feel demeaned or harassed. The complaints resulted primarily from the fact that some students simply disagreed with Dr. Thrasher's point of view about Palestine.

56. To the contrary, Dr. Thrasher went out of his way to make students feel supported and included. As Dean Whitaker recognized in April 2023, Dr. Thrasher "often [went] above and beyond the call of duty to help [students] realize their academic and professional goals."

57. Similarly, one former student later wrote a letter to the University in support of Dr. Thrasher, explicitly stating that he considers himself "very profoundly Jewish" and yet never felt threatened or alienated by the professor's words or actions, and reported that Dr. Thrasher served as a mentor to him and even guided him towards pursuing a doctoral degree.

58. Another letter submitted in support of Dr. Thrasher and signed by thousands of professors, journalists, medical professionals and public health scholars pointed out that Dr. Thrasher has an international reputation "that is not only tenure-worthy but would garner a full professorship at most universities."

59. In addition to being meritless, Dr. Thrasher's suspension also violated the due process protections promised by the Northwestern University Faculty Handbook ("the Handbook"), which states that faculty may be temporarily suspended during pending disciplinary proceedings only if the provost, the dean, and the chair of the University's Behavioral Consultation Team find that a faculty member "poses an immediate threat of harm to his or own safety, to the safety of others, and/or to Northwestern." Otherwise, faculty may be suspended only after a finding of violation of the University's Policy on Institutional Equity or a finding of misconduct following disciplinary proceedings. Ex. B at pp. 31-32, 36-39.

60. When Dr. Thrasher pointed out that his suspension violated the Handbook, Northwestern

erroneously responded that Dean Whitaker has the "discretion" to determine whether faculty will teach or not.

61. Whether or not faculty will teach is not a matter within the discretion of the dean; it is a core faculty responsibility and right.

62. Dr. Thrasher's employment contract promised, "Your required teaching load will be four courses per academic year." Ex. A. The Handbook also describes teaching as one of the primary responsibilities of faculty. Ex. B.

63. As a required part of its misconduct inquiry, Northwestern's Associate Provost for Faculty established an ad-hoc committee of three tenured Northwestern professors ("the Ad-Hoc Committee") to investigate the allegations contained in Dr. Thrasher's July 8, 2024 suspension letter.

64. On December 18, 2024, the Ad-Hoc Committee released a report of its findings regarding the misconduct investigation into Dr. Thrasher.

65. The Ad-Hoc Committee did not recommend any discipline, finding that there was not sufficient evidence to support disciplinary action and reported that "to the extent that any of Professor Thrasher's statements on social media or otherwise in public might be considered here, the committee believes those statements to be protected by academic freedom."

66. On January 16, 2025, Dean Whitaker confirmed that the disciplinary case was closed.

### E. The University's Third (and This Time Successful) Attempt to Discipline Dr. Thrasher

67. One day later, on January 17, 2025, Dean Whitaker notified Dr. Thrasher that Northwestern was opening a new disciplinary case against him, this time alleging that he "failed to follow instructions issued by NUPD officers to leave the area . . . [and] linked arms with others to prevent the officers from clearing the encampment and securing the meadow."

68. At the time this new investigation was opened, Dean Whitaker noted that he did not

11

"anticipate that the formation of an ad hoc faculty committee will be necessary."

69. During this time, Northwestern continued to face retaliation from the federal government for its agreement to end the Deering Meadow encampment, and Northwestern continued to attempt to appease the federal government about its efforts to suppress speech on Palestine.

70. On February 3, 2025, the U.S. Department of Education announced that it was forming a task force along with the Department of Justice and the Department of Health and Human Services to investigate Northwestern and four other universities for tolerating Palestine solidarity activism on campus. The Department of Education's press release stated that it would "build upon the foundational work of the House Committee on Education and the Workforce under then-Chairwoman Virginia Foxx, which found that university administrations 'overwhelmingly failed' to protect or support their Jewish students, even making 'astounding concessions' to illegal, anti-American encampments."

71. In or about February 2025, Northwestern University formally adopted the International Holocaust Remembrance Alliance ("IHRA")'s definition of antisemitism, which characterizes as anti-Semitic broad categories of non-discriminatory political speech regarding Zionism, the Israeli state and its policies, even when made by Jewish people.

72. Dr. Thrasher's criticism of Zionism is incompatible with the IHRA definition.

73. On or about March 10, 2025, the Department of Education warned Northwestern and 59 other universities "of potential enforcement actions if they do not fulfill their obligations under Title VI of the Civil Rights Act to protect Jewish students on campus."

74. On March 12, 2025, Dean Whitaker informed Dr. Thrasher that he was denied promotion and tenure based upon an 8-8 vote by Medill's Promotion and Tenure Committee ("the Medill Committee"), despite both Dean Whitaker and the Medill Committee having praised Dr. Thrasher's qualifications during his mid-tenure review less than two years prior.

75. Dean Whitaker explained that he was declining to award tenure because he "assessed [Dr. Thrasher's] teaching to be inadequate with serious concerns reported by some students."

76. The "serious concerns" Dean Whitaker referenced related to the same allegations the Ad-Hoc Committee previously rejected, noting that no evidence had been presented of mistreatment of students or classroom speech outside the appropriate boundaries of Dr. Thrasher's discipline. Those purported "concerns" were selectively culled from the record, while overwhelming evidence demonstrating Plaintiff's teaching proficiency was disregarded.

77. The Handbook promises, "Faculty are entitled to the freedom to discuss their subject in the classroom or other academic and related settings. As teachers, faculty encourage the free pursuit of learning in their students. They hold before them the best scholarly and ethical standards of their disciplines. Professors demonstrate respect for students as individuals and adhere to their proper roles as intellectual guides and counselors." Ex. B at p. 5.

78. The Handbook references and treats as authoritative several policy statements of the American Association of University Professors ("AAUP") relating to academic freedom and faculty governance, including the AAUP statement *On the Relationship of Faculty Governance to Academic Freedom* (1994). The 1994 statement emphasizes that faculty must be provided the freedom to guide their students in the development of analytical skills necessary for their respective disciplines; it states that "good teaching requires developing critical ability in one's students and an understanding of the methods for resolving disputes within the discipline." Ex. B at p. 6.

79. Dr. Thrasher publicly protested his tenure denial, alleging discrimination in some public statements. For example, according to a March 20, 2025 article in *The Daily Northwestern*, Dr. Thrasher called his tenure denial a "political hit job over my support for Palestine and for trying to protect our student protesters last year from physical attack," connecting his case to national trends in academia.

13

**F.      The University's Fourth and Final (Successful) Attempt to Discipline Dr. Thrasher**

80.  On March 27, 2025, Committee members Rep. Tim Walberg and Rep. Burgess Owens sent a letter to President Schill and Chairman Barris reminding Northwestern of the Committee's continuing investigation into Northwestern's "response to antisemitism on its campus." The letter complained about Northwestern's inadequate suppression of speech related to Palestine, including that the University "recently allowed the return to campus of journalism professor Steven Thrasher . . ." despite his role at the encampment.

81. On March 30, 2025, 117 Medill School students and alumni published an op-ed in *The Daily Northwestern* castigating the University and Dean Whitaker for Dr. Thrasher's tenure denial and characterizing it as a "disturbing concession to authoritarian forces that actively pose an existential threat" and a serious threat to the future of academia, the profession of journalism, and students with already marginalized identities. The op-ed also called on Northwestern faculty, particularly Medill faculty, to express outrage over Dr. Thrasher's termination.

82. On March 31, 2025, the day before Professor Thrasher was scheduled to return to teaching for the spring quarter, Dean Whitaker informed him by letter that he was removed from teaching once again. He wrote,

> Your public lobbying, mischaracterizations and efforts to encourage pressure from groups complicate and compromise the process of tenure review, decision making, and appeal. Therefore, we are concerned about your presence with students in our community. Medill is removing you from classes for the spring term. Furthermore, you will not be assigned classes to teach in the 2025-26 academic year.

83. Upon receiving this letter, Plaintiff contacted Northwestern's Office of the General Counsel, seeking an explanation of the alleged mischaracterizations and asking which policies, if any, Northwestern contended he had violated. Ex. B at p. 44. The General Counsel's office did not identify any mischaracterizations nor any policies that were violated.

84. On or about April 5, 2025, the federal government froze $790 million in federal funding to

14

Northwestern.

85. On May 13, 2025, the U.S. Department of Health and Human Services announced a Title VI investigation into Northwestern following a complaint by an outside advocacy organization about "systemic concerns regarding the University's actions to maintain a campus climate, academic direction, and institutional policy that ensures nondiscrimination on the basis of race, color, and national origin."

86. On May 30, 2025, Dr. Thrasher submitted an appeal of his tenure denial through the University's internal appeal process, pursuant to applicable Guidelines for Handling Appeals Made to the University Faculty Appeals Panel ("Appeal Guidelines"). Ex. C.

87. The Appeal Guidelines state that upon a faculty member's submission of an appeal, "the Chair [of the Executive Committee] should consult with the other members of the [Faculty Appeals Panel Executive Committee] to determine whether the Appeal was timely filed and whether the Appeal sufficiently alleges one or more grounds for an appeal that is within [Faculty Appeals Panel's] jurisdiction, as described in the Faculty Handbook." Ex. C at p. 4.

88. On July 24, 2025, Associate Provost for Faculty Sumit Dhar informed Dr. Thrasher that the Executive Committee of the Faculty Appeals Panel, whose members are appointed by the Provost's office, had "completed its review of [his] appeal and unanimously decided not to refer the matter to a faculty Ad Hoc Committee for further review."

89. On July 29, 2025, Dr. Thrasher appealed Northwestern's refusal to review his appeal to the Board of Trustees. He wrote that because his 21-page appeal alleged two grounds for appeal within the Faculty Appeals Panel's jurisdiction, it was required to be referred to a faculty Ad Hoc committee for further review.

90. On August 5, 2025, President Schill was compelled to testify in private to the Committee. He was again questioned harshly about his decision to enter into the Deering Meadow agreement.

91. On September 4, 2025, President Schill announced his resignation from Northwestern.

92. On September 23, 2025, the Board of Trustees denied Dr. Thrasher's appeal on the perfunctory claim that it had "determined that [Dr. Thrasher's] initial appeal to the Faculty Appeals Panel received due process."

93. Because Northwestern could not credibly deny only Dr. Thrasher the right to a substantive review of his tenure appeal, on information and belief, Northwestern denied a substantive review for all faculty who appealed tenure denials in the academic year during the 2024-25, exhibiting a willingness to deny all faculty due process in order to suppress advocacy for Palestinians.

94. Because faculty who are denied tenure are terminated from employment at the end of the academic year following the tenure denial, Dr. Thrasher's employment will end on August 31, 2026.

**G.      Northwestern's Reward for Terminating Dr. Thrasher and Enacting the Federal Government's Desired Restrictions on Campus Free Speech**

95. On November 28, 2025, Northwestern announced that it had reached an agreement with the federal government that restored the frozen $790 million in federal funding.

96. As a condition to its agreement to restore the federal funding, Northwestern unilaterally rescinded the Deering Meadow agreement, reversed all policies that were implemented or scheduled to be implemented in adherence to the agreement, and agreed to pay the federal government $75 million.

97. As a condition to its agreement to restore federal funding, Northwestern changed its Demonstration Policy, Display and Solicitation Policy, Student Handbook, and Student Code of Conduct, and imposed new restrictions on how, when, and where faculty, staff, and students can protest and the subject matters which they can protest.

98. Northwestern's adverse actions against Dr. Thrasher were the direct result of the Committee's criticism of Northwestern's response to the Deering Meadow encampment, its demands that Northwestern exclude Dr. Thrasher from the University and from campus, and the

Agency Defendants' investigation and threats.

99. Northwestern's adverse actions against Dr. Thrasher are directly and fairly attributable to the federal government's desire to restrict Dr. Thrasher's expression of free speech and punish Northwestern for Dr. Thrasher's academic and political speech.

100. Due to Northwestern's actions, Dr. Thrasher is effectively blacklisted from academia and has been unable to secure a comparable position, causing irreversible economic and reputational harm.

## Count I

### Breach of Contract
### Against Northwestern

101. Each prior paragraph of this complaint is incorporated as if fully restated herein.

102. Dr. Thrasher's appointment letter, the Faculty Handbook, and the Appeal Guidelines comprise part of his employment contract with the University. Exs. A-C.

103. Dr. Thrasher had access to the policies reflected in Exhibits B and C throughout his employment as an Assistant Professor. There were no substantive changes to the applicable sections of those policies at any time relevant to the allegations herein.

104. Dr. Thrasher performed his contractual duties as an Assistant Professor at the University starting on June 1, 2019.

105. Dr. Thrasher's employment contract specified that he would be reviewed for tenure during the 2024-25 academic year.

106. Northwestern breached its contract with Dr. Thrasher by refusing to allow him to teach during the 2024-25 and 2025-26 academic years even though he had not been found to have committed misconduct, had not been found to have violated the Policy on Institutional Equity, and

17

even though Northwestern did not even attempt to follow the required prerequisites for Temporary Suspension under the Handbook.

107. Northwestern breached its contract with Dr. Thrasher by denying him tenure because of his campus speech about Palestine and isolated student discomfort with his classroom speech about Palestine and sexuality, in violation of his right to academic freedom.

108. Northwestern breached its contract with Dr. Thrasher by refusing to allow substantive review of his tenure appeal in violation of the Appeal Guidelines.

109. Northwestern breached its contract with Dr. Thrasher by terminating his Daniel J. Renberg Chair position prior to August of 2028.

110. As a result of these breaches, Northwestern prohibited Dr. Thrasher from teaching for two years, denied him promotion to Associate Professor with tenure, refused to conduct a substantive review of his tenure appeal, terminated him from his position, and caused him loss of wages and benefits, reputational harm, and emotional distress.

## Count II

### First Amendment Retaliation
### Against Defendant Walberg

111. Each prior paragraph of this complaint is incorporated as if fully restated herein.

112. Dr. Thrasher engaged in constitutionally-protected speech when he joined students in Northwestern's Gaza Solidarity Encampment, gave a speech in solidarity with Palestinian journalists under attack, and supported freedom for Palestinians on social media.

113. The Committee repeatedly pressured Northwestern to terminate Steven Thrasher's employment. These communications were not made in furtherance of a legislative purpose within the meaning of the Constitution's Speech or Debate clause. Although the Committee's members

presented their coercion as part of a broader investigation into antisemitism on campus, they demanded specific employment consequences for Dr. Thrasher's protected speech.

114. The Committee's questions to President Schill during its May 23, 2024 hearing made clear that it was Dr. Thrasher's political Palestine activism that motivated its demands that his employment be terminated. For example, Rep. Banks chided President Schill for allowing faculty to encourage students to engage in "that type of political behavior to go participate and lock arms with the encampments."[1]

115. The Committee's June 7, 2024 letter demanded a response regarding what employment consequences the University imposed on Dr. Thrasher as a result of his role in the encampment.

116. And the Committee's March 27, 2025 letter expressed dismay that the University "recently allowed the return to campus of journalism professor Steven Thrasher . . . ."

117. The Committee's demands that Northwestern terminated Dr. Thrasher's employment resulted from its hostility to his viewpoint on Palestine.

118. As a result of this pressure, Northwestern prohibited Dr. Thrasher from teaching for two years, denied him promotion to Associate Professor with tenure, refused to conduct a substantive review of his tenure appeal, terminated him from his position, and caused him loss of wages and benefits, reputational harm, and emotional distress.

---

[1] *Calling for Accountability: Stopping Antisemitic College Chaos*, Hearing Before the Committee on Education and the Workforce, U.S. House of Representatives, One Hundred Eighteenth Congress, Second Session, Hearing Held in Washington, D.C., May 23, 2024, p. 60 (emphasis added), *available at* https://files.eric.ed.gov/fulltext/ED663736.pdf

## Count III

### First Amendment Retaliation
### Against Agency Defendants

119.    Each prior paragraph of this complaint is incorporated as if fully restated herein.

120.    Dr. Thrasher engaged in constitutionally-protected speech when he joined students in Northwestern's Gaza Solidarity Encampment, gave a speech in solidarity with Palestinian journalists under attack, supported freedom for Palestinians on social media, and engaged in classroom discourse related to politics and sexuality in his contemporary journalism course, *Sex and the American Empire*.

121.    The Agency Defendants signaled that they would withhold large amounts of federal funding if Northwestern did not go further than it had in the past to suppress campus speech on Palestine. Among the "accountability" actions the Agency Defendants expected was termination of faculty who expressed solidarity with Palestine and imposition of the IHRA definition of antisemitism on the campus.

122.    The Agency Defendants' threats resulted from its hostility to the expression on campus of viewpoints supportive of human rights for Palestinians.

123.    Working in coordination with the other Agency Defendants, the Department of Education explicitly stated its intent to build on the coercion of the Committee and threatened "enforcement actions."

124.    As a result of this pressure, Northwestern denied Dr. Thrasher promotion to Associate Professor with tenure, refused to conduct a substantive review of his tenure appeal, terminated him from his position, and caused him loss of wages and benefits, reputational harm, and emotional distress.

## Count IV

### First Amendment Retaliation
### Against Northwestern

125.     Each prior paragraph of this complaint is incorporated as if fully restated herein.

126.     Dr. Thrasher engaged in constitutionally-protected speech when he joined students in Northwestern's Gaza Solidarity Encampment, gave a speech in solidarity with Palestinian journalists under attack, and supported freedom for Palestinians on social media, and engaged in classroom discourse related to politics and sexuality in his contemporary journalism course, Sex and the American Empire.

127.     Northwestern knew that Dr. Thrasher's campus speech was inconsistent with the IHRA definition and the "academic direction" the Agency Defendants wanted Northwestern to pursue.

128.     Rather than protect the academic freedom of its faculty, Northwestern complied with the demands of the Committee and Agency Defendants by excluding Dr. Thrasher from teaching and then terminating his employment.

129.     Through these actions, Northwestern willingly served as an agent of elements of the federal government in its desire to suppress Dr. Thrasher's point of view.

130.     Without Northwestern's cooperation, the remaining defendants could not have secured Dr. Thrasher's exclusion from Northwestern.

131.     In retaliation for his protected speech, Northwestern prohibited Dr. Thrasher from teaching for two years, denied him promotion to Associate Professor with tenure, refused to conduct a substantive review of his tenure appeal, terminated him from his position, and caused him loss of wages and benefits, reputational harm, and emotional distress.

**Count V**

**Discrimination on the Basis of Race**
**Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1)**
**Against Northwestern**

132.     Each prior paragraph of this Complaint is incorporated as if fully restated herein.

133.     Dr. Thrasher is Black.

134.     In terminating Dr. Thrasher's employment, Northwestern was motivated in part by his race. Several non-Black faculty and staff who protected students against the NU Police in the same manner as Dr. Thrasher were not subjected to disciplinary investigation into that incident and were not terminated from employment.

135.     Non-Black faculty members at the Medill School were granted tenure with comparable or inferior tenure dossiers.

136.     The reasons Northwestern identified for Dr. Thrasher's tenure denial were lacking in factual basis, were not the actual causes of the tenure denial and/or were insufficient to warrant the denial of tenure, and were therefore pretextual.

137.     As a result of this discrimination, Northwestern caused Dr. Thrasher to suffer a prohibition from teaching for two years, denial of promotion to Associate Professor with tenure, dismissal of his tenure appeal, employment termination, loss of wages and benefits, reputational harm, and emotional distress.

## Count VI

### Discrimination on the Basis of Race
### 775 ILCS 5 §§ 1-102, 2-102
### Against Northwestern

119. Each prior paragraph of this Complaint is incorporated as if fully restated herein.

120.    Dr. Thrasher is Black.

121.    In terminating Dr. Thrasher's employment, Northwestern was motivated in part by his race. Several non-Black faculty and staff who protected students against the NU Police in the same manner as Dr. Thrasher were not subjected to disciplinary investigation into that incident and were not terminated from employment.

122.    Non-Black faculty members at the Medill School were granted tenure with comparable or inferior tenure dossiers.

123.    The reasons Northwestern identified for Dr. Thrasher's tenure denial were lacking in factual basis, were not the actual causes of the tenure denial and/or were insufficient to warrant the denial of tenure, and were therefore pretextual.

124.    As a result of this discrimination, Northwestern caused Dr. Thrasher to suffer a prohibition from teaching for two years, denial of promotion to Associate Professor with tenure, dismissal of his tenure appeal, employment termination, loss of wages and benefits, reputational harm, and emotional distress.

## Count VII

### Discrimination on the Basis of Sex (Sexual Orientation)
### Title VII, 42 U.S.C. § 2000e-2(a)(1)
### Against Northwestern

125.    Each prior paragraph of this Complaint is incorporated as if fully restated herein.

126.    Dr. Thrasher is openly gay and engages in teaching, research, scholarship, and advocacy on matters related to LGBTQ communities.

23

127. Although Northwestern supported Dr. Thrasher's work on these issues throughout most of his employment and was pleased with the renown and funding it brought to the University, Northwestern began to perceive Dr. Thrasher's sexual orientation as a liability by virtue of the Trump administration's campaign to denigrate and vilify LGBTQ communities.

128. As a result, when faculty and staff linked arms to protect students during the encampment, and the Committee launched an investigation into the encampment, three of the four employees Northwestern chose to criminally charge were Queer.

129. In terminating Dr. Thrasher's employment, Northwestern was motivated in part by his sexual orientation.

130. Heterosexual faculty members at the Medill School were granted tenure with comparable or inferior tenure dossiers.

131. The reasons Northwestern identified for Dr. Thrasher's tenure denial were lacking in factual basis, were not the actual causes of the tenure denial and/or were insufficient to warrant the denial of tenure, and were therefore pretextual.

132. As a result of this discrimination, Northwestern caused Dr. Thrasher to suffer a prohibition from teaching for two years, denial of promotion to Associate Professor with tenure, dismissal of his tenure appeal, employment termination, loss of wages and benefits, reputational harm, and emotional distress.

## Count VIII

### Discrimination on the Basis of Sex (Sexual Orientation)
### 775 ILCS 5 §§ 1-102, 2-102
### Against Northwestern

133.     Each prior paragraph of this Complaint is incorporated as if fully restated herein.

134.     Dr. Thrasher is openly gay and engages in teaching, research, scholarship, and advocacy on matters related to LGBTQ communities.

135.     Although Northwestern supported Dr. Thrasher's work on these issues throughout most of his employment and was pleased with the renown and funding it brought to the University, Northwestern began to perceive Dr. Thrasher's sexual orientation as a liability by virtue of the Trump administration's campaign to denigrate and vilify LGBTQ communities.

136.     As a result, when faculty and staff linked arms to protect students during the encampment, and the Committee launched an investigation into the encampment, three of the four employees Northwestern chose to criminally charge were Queer.

137.     In terminating Dr. Thrasher's employment, Northwestern was motivated in part by his sexual orientation.

138.     Heterosexual faculty members at the Medill School were granted tenure with comparable or inferior tenure dossiers.

139.     The reasons Northwestern identified for Dr. Thrasher's tenure denial were lacking in factual basis, were not the actual causes of the tenure denial and/or were insufficient to warrant the denial of tenure, and were therefore pretextual.

As a result of this discrimination, Northwestern caused Dr. Thrasher to suffer a prohibition from teaching for two years, denial of promotion to Associate Professor with tenure, dismissal of his tenure appeal, employment termination, loss of wages and benefits, reputational harm, and emotional distress.

25

## Count IX

### Discrimination on the Basis of Association with Palestinians
### Against Northwestern
### Title VII, 42 U.S.C. § 2000e-2(a)(1)

140.     Each prior paragraph of this Complaint is incorporated as if fully restated herein.

141.     Palestinians are members of an ethnic group protected by 42 U.S.C. § 1981.

142.     Dr. Thrasher advocated for and with Palestinians at the Northwestern encampment and on social media. He incorporated discussions about Palestine into one of his journalism courses in the Spring of 2024. Northwestern cited to subjective and isolated student discomfort with some of those discussions as bases for his termination.

143.     Northwestern terminated Dr. Thrasher's employment because of its hostility to that advocacy, engagement, solidarity, and association, even while Northwestern tolerated other faculty members' political discourse about topics other than Palestine and their associations with and advocacy for other ethnic groups.

144.     As a result of this discrimination, Northwestern caused Dr. Thrasher to suffer a prohibition from teaching for two years, denial of promotion to Associate Professor with tenure, dismissal of his tenure appeal, employment termination, loss of wages and benefits, reputational harm, and emotional distress.

## Count X

### Discrimination on the Basis of Association with Palestinians
### Against Northwestern
### 775 ILCS 5 §§ 1-102, 2-102

145.    Each prior paragraph of this Complaint is incorporated as if fully restated herein.

146.    Palestinians are members of an ethnic group protected by 42 U.S.C. § 1981.

147.    Dr. Thrasher advocated for and with Palestinians at the Northwestern encampment and on social media. He incorporated discussions about Palestine into one of his journalism courses in the Spring of 2024. Northwestern cited to subjective and isolated student discomfort with some of those discussions as bases for his termination.

148.    Northwestern terminated Dr. Thrasher's employment because of its hostility to that advocacy, engagement, solidarity, and association, even while Northwestern tolerated other faculty members' political discourse about topics other than Palestine and their associations with and advocacy for other ethnic groups.

149.    As a result of this discrimination, Northwestern caused Dr. Thrasher to suffer a prohibition from teaching for two years, denial of promotion to Associate Professor with tenure, dismissal of his tenure appeal, employment termination, loss of wages and benefits, reputational harm, and emotional distress.

## Count XI

### Race Discrimination
### Against Northwestern
### 42 U.S.C. § 1981

150. Each prior paragraph of this Complaint is incorporated as if fully restated herein.

151. Dr. Thrasher is Black and is a member of a racial group protected by 42 U.S.C. § 1981.

152. Palestinians are members of an ethnic group protected by 42 U.S.C. § 1981.

153. But for Dr. Thrasher's race and his association with Palestinians, Northwestern would not have terminated his employment.

154. As a result of this discrimination, Northwestern caused Dr. Thrasher to suffer a prohibition from teaching for two years, denial of promotion to Associate Professor with tenure, dismissal of his tenure appeal, employment termination, loss of wages and benefits, reputational harm, and emotional distress.

## Count XII

### Retaliation for Opposing Discrimination
### Against Northwestern
### 42 U.S.C. § 1981

155. Each prior paragraph of this Complaint is incorporated as if fully restated herein.

156. Dr. Thrasher characterized Northwestern's denial of his application for promotion and tenure as discriminatory in statements to the media.

157. Northwestern reimposed Dr. Thrasher's suspension from teaching and refused to conduct a substantive review of his tenure appeal because of those statements.

158. As a result of this retaliation, Northwestern caused Dr. Thrasher to suffer a prohibition from teaching for the 2025-26 year, denial of promotion to Associate Professor with

tenure, dismissal of his tenure appeal, employment termination, loss of wages and benefits, reputational harm, and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief against Defendants as follows:

1. An order requiring Defendant Northwestern University to pay Plaintiff all wages and benefits he would have received but for the illegal actions alleged herein, with compounding interest thereon;

2. An order requiring Defendant Northwestern University to reinstate Plaintiff to a tenure-line position at Medill; or, in the alternative, requiring Defendant Northwestern University to pay Plaintiff an amount equal to the wages and benefits he would be expected to receive with such a reinstatement over the course of his career;

3. An order requiring Defendant Northwestern University to conduct a tenure review that complies with Northwestern's employment contract with Plaintiff, followed by the grant of tenure if the review is successful, effective starting in the 2025-26 academic year;

4. An injunction invalidating the agreement between Defendant Northwestern University and the United States to the extent that it requires imposition of the IHRA definition and suppression of campus speech on Palestine;

5. A permanent injunction prohibiting the government defendants from pressuring Defendant Northwestern University to suspend or terminate the employment of faculty members;

6. Compensation for Plaintiff's emotional distress and physical sickness against Defendant Northwestern University;

7. Compensation for Plaintiff's reputational harm against Defendant Northwestern University;

29

8.  Punitive damages against Defendant Northwestern University;

9.  Other compensatory damages;

10. Attorneys' fees and litigation costs; and

11. Such other relief as law and justice allow.

## JURY DEMAND

Plaintiff requests a trial by jury with respect to any issues so triable.

DATED: July 13, 2026

Respectfully submitted,

*Steven Thrasher, Plaintiff*

/s/ Rima Kapitan

KAPITAN GOMAA LAW, P.C.
Rima Kapitan (Atty No. 6286541)
Yusra Gomaa (Atty No. 6299883)
Danya Rashed (Atty No. 6346374)
P.O. Box 46503
Chicago, IL 60646
Phone: (312) 566-9590
rima@kapitangomaa.com

WILLIAM REYNOLDS LAW, LTD.
William Reynolds (Atty No. 6313812)
33 North Dearborn Street, Suite 1000
Chicago, IL 60602
Phone: (630) 600-9922
bill@reynoldsand.com